071315

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

DAVIS C. HAWN,

        Plaintiff,

v.                                                       CASE NO. 3:07CV97/RV/EMT

SHORELINE TOWERS PHASE 1
CONDOMINIUM ASSOCIATION, INC.,
JEFFREY LUTHER, NORMA FREEMAN,
JAMES L. BRAZEALE, GREG O'BRIEN,
WILLIAM L. GINGER, III, DESSIE DAVIS and
CRAIG L. FAUST,

        Defendants.

_____

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND INCORPORATED MEMORANDUM OF LAW

COMES NOW, Defendants, SHORELINE TOWERS PHASE 1 CONDOMINIUM ASSOCIATION, INC. ("SHORELINE TOWERS"), JEFFREY LUTHER ("LUTHER"), NORMA FREEMAN ("FREEMAN"), JAMES L. BRAZEALE ("BRAZEALE"), GREG O'BRIEN ("O'BRIEN"), WILLIAM L. GINGER, III ("GINGER"), DESSIE DAVIS ("DAVIS"), and CRAIG L. FAUST ("FAUST"), by and through its undersigned counsel, and files this Motion for Summary Judgment and Incorporated Memorandum of Law.

Defendants are entitled to Summary Judgment because the record reveals no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law. The legal basis for this motion is:

    1. That the Plaintiff cannot satisfy his prima facie burden under either the Florida or Federal

Fair Housing Act;

2. That the Plaintiff cannot satisfy his prima facie burden under Florida law on the claims of intentional infliction of emotional distress;

3. That the individual Defendants are immune from suit under F.S. 617.0834 as they are members of the Board of Directors of a not for profit organization and no exception to that law is proven by the record.

## PRELIMINARY STATEMENT

*A. The Nature of the Action.*  Plaintiff bought a condominium at Shoreline Towers knowing that the condominium did not allow pets. He subsequently bought a dog named Booster.  In January 2005, Plaintiff sent a memorandum to all other Shoreline Towers owners proposing that the no pet rule be changed because of his desire to bring his dog Booster to his unit and then in the Spring of 2005, he made an unsuccessful run for a seat on the condominium Board of Directors.

After failing in his bid for election to the Board of Directors, the Plaintiff procured a certificate that his dog was a "Service Animal" after it passed a "Good Citizenship Test".  The Plaintiff then submitted a letter to the Shoreline Towers Board of Directors[1] asking for a handicap "accommodation" under the Fair Housing Act in the form of permission to bring his dog Booster to his condominium.  This "accommodation" request was accompanied by letters from a chiropractor, Dr. Hoda, and a psychologist, Dr. Evans, saying that the Plaintiff had a physical and psychological disability and that he required the use of Booster as a service animal.

After receipt of the Plaintiff's request for an "accommodation", the Board requested that he

---

[1]    The individual Defendants are the members of the Shoreline Towers Board of Directors at this time.

-2-

provide more information about the chiropractor and psychologist's qualifications and that their opinions be provided under oath. The Plaintiff was informed that his request for an accommodation was denied until such information was received. The Plaintiff never provided any further information and instead utilized the same two letters in support of an administrative claim to the Florida Commission on Human Relations, which found probable cause based on these letters. The Plaintiff subsequently saw an orthopedic surgeon, Dr. Schiavi, a psychiatrist, Dr. Zen, he hired a forensic psychologist and an attorney and he filed this lawsuit.

Discovery in this action has showed that the Plaintiff's supposed physical disability underlying the plaintiff's claim is thigh pain from a bruise he received many years before 2006 and for which he never had any treatment before making his demand for a handicap "accommodation". Dr. Hoda testified that he had only examined the Plaintiff once before signing the letter the Plaintiff submitted to the Defendants, that this exam occurred in 1999, and that he had never treated the Plaintiff. As for the supposed psychological handicap, Dr. Evans testified that this is based upon Post Traumatic Stress Disorder resulting from the cessation of an abusive interpersonal relationship. Dr. Evans also testified that he had only had three therapy sessions with the plaintiff before signing the letter presented to the Defendants. Also, both Dr. Hoda and Dr. Evans admitted that the Plaintiff provided them with all or most of the language in the letters they signed.

Plaintiff seeks a determination under the Fair Housing Act that he be allowed to take his dog to the condominium. He also claims damages for the tort of intentional infliction of emotional distress under Florida law.

*B. Summary of Argument.* Defendants are entitled to summary judgment. First and foremost, the individual Board member Defendants are immune from liability under by operation

of Fla. Stat. 617.0834. Moreover, Plaintiff DAVIS HAWN ("HAWN") has not, and cannot,
establish that Defendants have engaged in sufficiently outrageous conduct to meet the high threshold
imposed by Florida law to assert an intentional infliction of emotional distress claim. Additionally,
HAWN's claims under both the Florida and Federal Fair Housing Acts should also be dismissed as
a matter of law because HAWN is not handicapped as that term is defined under both statutes, and
even if he were, it is not a reasonable accommodation to ask a condominium association to ignore
long standing rules regarding ownership of pets that was in effect at the time HAWN purchased his
unit.

## FACTUAL BACKGROUND AND STATEMENT OF UNDISPUTED FACTS

1.      Plaintiff, DAVIS C. HAWN ("HAWN"), is the owner of unit 3023 in Shoreline
Towers Phase III since June 2004. (Pl's 2d Supp. Resp. to Defs.' 1st Interrog. #2), Exhibit A.

2.      Defendants, LUTHER, FREEMAN, BRAZEALE, O'BRIEN, GINGER, DAVIS,
and FAUST, are on SHORELINE TOWERS' Board of Directors ("Board"). (Luther Dep., p. 5 ,
Exhibit B);  Ginger Dep., p. 5, Exhibit C; Deposition Transcript of Greg O'Brien, p.5, Exhibit D;
Deposition Transcript of Norma Freeman, p. 4, Exhibit E; Deposition Transcript of Dessie Davis,
p. 4, Exhibit F).

3.      For over ten years, the Declaration of Condominium for SHORELINE TOWERS
has included the following rule: "An apartment owner shall not keep any pet in his Apartment
except under the regulations promulgated by the Association from time to time." Luther Dep., p.
54, Exhibit B.

4.      HAWN was aware of the rule prohibiting unit owners from having animals on the
premises at the time he purchased his condominium unit. Hawn Dep., 161-162, Exhibit G.

5.     SHORELINE TOWERS erected a sign stating: "No Animals Allowed" in or before 1998. Luther Dep., p. 60, Exhibit B.

6.     HAWN's psychologist, Dr. Patrick Evans, diagnosed HAWN with stable post-traumatic stress disorder and dysthymia in May 2006. Deposition Transcipt of Patrick Evans, Ph.D, p.8-10, Exhibit H.   Dr. Evans opined that HAWN's eight-year relationship with a violent substance abuser was a contributing factor to HAWN's mental condition. Evans Dep., p. 31, Exhibit H.   Dr. Evan's met with HAWN on three occasions. Hawn Dep., p. 166, Exhibit G, Evans Dep., p. 27-41, Exhibit H.

7.     HAWN states that he suffers from a mental disability that causes him to be in constant fear and which precludes him from being able to be alone on the subject property.  He further states that these impairments affect his ability to concentrate, learn, work, sleep, and interact normally with others. Hawn Dep., p. 74; 127-128, Exhibit G.  Without Booster, HAWN indicates that his social anxiety level can become severe.  Hawn Dep., p. 128, Exhibit G_.

8.     On January 5, 2005, HAWN sent a letter to SHORELINE TOWERS and the Board. His letter proposed a change to the existing Association rules which would allow his "pet" Booster access to the property.  A copy of this letter is attached hereto as Exhibit I.  This letter does not indicate that HAWN is disabled.  Likewise, neither letter referred to Booster as a "service animal."

9.     On May 4, 2006, Dr. Desmond Hoda, HAWN's chiropractor, issued a letter stating HAWN had a disability and needed a "companion animal", a copy of which is attached as Exhibit J. This letter was drafted by HAWN and signed by Dr. Hoda after having only examined HAWN once in 1999.  Hoda Dep., p. 17-19, 27, Exhibit K.  HAWN utilized a form letter he obtained from a website. Hawn Dep., p. 98, Exhibit G.

10.    Dr. Hoda only performed exams on HAWN. Hoda Dep., p. 26, Exhibit K. He never rendered any treatment for HAWN. *Id.*, Exhibit K.

11.    On May 31, 2006, Dr. Evans issued a letter supporting HAWN's "wish for Booster [to be] validated as a service dog." a copy of which is attached as Exhibit L. This letter was drafted by HAWN. Hawn Dep., p. 98, Exhibit G.

12.    Dr. Evans only met with HAWN three times before signing the May 31, 2006 letter. Evans Dep., p. 27-41, Exhibit H. HAWN utilized a form letter he obtained from a website. Hawn Dep., p. 98, Exhibit G.

13.    Dr. Frank Schiavi, opined in April-May of 2007 that HAWN had a general good range of motion and can essentially perform whatever tasks he wishes, but if "does a little bit too much during the day" he "may" have problems with pain and leg aches. Deposition of Frank Schiavi, M.D., p. 5, 10, 13, 16-17, Exhibit M.

14.    In examining HAWN, Dr. Frank Shiavi relied on a "mini fuctional capacity exam" in assessing HAWN's functional needs and status. Deposition of Frank Shiavi, M.D., p. 25; p. 16-17. This exam was conducted by Joseph Frame, a physical therapist. Deposition Transcript of Joseph Frame, p. 5, 6, 13, Exhibit N. The mini fuctional capacity exam conducted by Mr. Frame consisted of listening to HAWN's subjective complaints, following by looking at HAWN's left leg, whereupon HAWN was asked to move his leg while Mr. Frame checked his range of motion. Frame Dep., p.18-20, Exhibit N.

15.    In June 2006, HAWN traveled to Vermont to get Booster certified under the Service Animal Registry of America and on Booster passed the Therapy Dogs International certification test, a copy of said test is attached hereto as Exhibit O.

-6-

16.     On June 25, 2006, HAWN sent a new written request to SHORELINE TOWERS and the Board for permission to have Booster in his unit with him. In this request, he indicated his need for accommodation due to his physical and mental disabilities and he referred to Booster for the first time as a "service animal." *See* letter dated June 25, 2006 from Davis Hawn to Shoreline Towers Board of Directors, attached hereto as Exhibit P.

17.     On July 29, 2006, HAWN attended a board meeting held by SHORELINE TOWERS. The Board did ask him to explain his personal history or medical conditions at the meeting. The Board also did not require HAWN to attend. Deposition Transcript of Judy Williams, p. 9, Exhibit Q. HAWN did both voluntarily. HAWN states that he was "very tearful and emotional" at the meeting and that the Board treated him poorly. (Pl.'s 2d Supp. Resp. to Interrog. #2-3).

18.     Aside from voting no to his request to change SHORELINE's no pet policy, HAWN admits that he has no issue with any of the individual Board members, with the exception of LUTHER, whom HAWN believes attempted to intimidate him by suggesting that one other person attempted to change the policy and failed. Hawn Dep., p. 177-179, Exhibit G.

19.     In August 2006, SHORELINE TOWERS and the Board asked HAWN to provide additional documentation of his disability. In addition, SHORELINE TOWERS requested information regarding the qualifications of Dr. Evans and Dr. Hoda. Luther Dep., p. 17, Exhibit B. *See* also a copy of September 13, 2006 letter to Davis Hawn from Judy Williams, attached hereto as Exhibit Q.

20.     Despite SHORELINE TOWERS efforts to acquire additional information from HAWN, HAWN never responded to SHORELINE TOWERS' requests. Luther Dep., p. 17, Exhibit B.

21.    On September 13, 2006, SHORELINE TOWERS sent HAWN a letter indicating that they could not authorize Booster's presence on the property without the additional information previously requested. Exhibit R.

22.    On September 20, 2006, HAWN filed a complaint with the Florida Commission on Human Relations ("FCHR").

23.    FCHR rendered its report on January 9, 2007.

24.    In May 2007, HAWN attempted to rent a unit (and bring Booster on to the premises) from SHORELINE TOWERS. He asked the property manager if she had a room that he could rent for three nights. He was informed that SHORELINE TOWERS would be unable to rent him a unit without first getting the additional information previously requested. HAWN states that he suffered an "emotional breakdown" when he was turned away. Williams Dep., p. 38-40, Exhibit Q.

## MEMORANDUM OF LAW

### I.    LEGAL STANDARD.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The moving party bears the initial responsibility of stating the basis for an absence of genuine issues of material fact. Issues of fact are genuine only if a reasonable jury considering the evidence presented could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the position will be insufficient." *Id.* The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissable at trial. *Avirgan v. Hull,* 932 F.2d 1572 (11th Cir. 1991). "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-51. Moreover, to survive a motion for summary judgment, the nonmoving party must proffer evidence beyond what is asserted in the pleadings. *Celotex,* 477 U.S. at 324. Where the non- moving party has "failed to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," no genuine issue of material fact exists. *Id.* at 322-23.

### II.   DEFENDANTS, LUTHER, FREEMAN, BRAZEALE, O'BRIEN, GINGER, DAVIS, AND FAUST, MUST FAIL BECAUSE INDIVIDUAL BOARD MEMBERS ENJOY IMMUNITY UNDER FLA. STAT. § 617.0834.

Because the BOARD MEMBERS are immune from tort liability, this Court should grant summary judgment in their favor as to HAWN's intentional infliction of emotional distress claim.

Under Fla. Stat. §617.0834, board members cannot be held individually liable for "monetary damages to any person for any statement, vote, decision, or failure to take an action, regarding organizational management or policy" unless they breach or fail to perform their duties as officers of the organization and their conduct constitutes a crime, fraud, self-dealing, or unjust enrichment. Fla. Stat. §§ 617.0834, 607.0831 (2007); *Sonny Boy, LLC v. Asnani*, 879 So. 2d 25, 28 (Fla. 5th DCA 2004); *Perlow v. Goldberg*, 700 So. 2d 148, 150 (Fla. 3d DCA 1997) (citing *Munder v. Circle One Condo., Inc.*, 596 So. 2d 144 (Fla. 4th DCA 1992)). Valid public policy reasons support this statutory immunity. *Perlow*, 700 So. 2d at 150. As explained in *Perlow*, "it would undoubtedly be difficult to find persons willing to serve on condominium boards of directors—which generally comprise volunteers from among the condominium owners—if immunity from individual liability . . . was not upheld." *Id.*

Section 617.0834 applies here because SHORELINE TOWERS is a Florida nonprofit corporation, and Defendants, LUTHER, FREEMAN, BRAZEALE, O'BRIEN, GINGER, DAVIS, and FAUST are on SHORELINE TOWERS' Board of Directors. (Compl. ¶¶ 2-9). These BOARD MEMBERS are officers and directors under section 617.0834 and are immune from liability for any actions taken in this capacity *unless* such actions constitute a crime, fraud, self-dealing, or unjust enrichment. See also *Sonny Boy, LLC*, 879 So. 2d at 28; *Perlow*, 700 So. 2d at 149-150.

Plaintiff argues that SHORELINE TOWERS intended to intimidate and humiliate him by enforcing the condominium association's established rules and regulations. (Compl. ¶¶ 23-26, 70-71); (Pl.'s 2d Supp. Resp. to Defs.' 1st Interrog. #2, Exhibit A). For example, HAWN contends that SHORELINE TOWERS knew that HAWN's mental and physical well-being depended on having Booster (his dog) live with him in his condominium. *Id.* HAWN claims SHORELINE TOWERS

demonstrated indifference to his needs by denying his requests to be exempted from the Association's rules and regulations prohibiting animals from living on the premises. *Id.* He also asserts that he was treated poorly at a Board meeting. SHORELINE TOWERS apparently demeaned HAWN by referring to Booster as a mere "pet." *Id.*; Deposition Transcript of Davis Hawn, p. 161-162, Exhibit G.

This conduct simply does not rise to the level of conduct for which Board members are statutorily liable. The undisputed facts of record do not establish any form of fraud or criminal activity by the BOARD MEMBERS. Fraud occurs where there has been "a knowing misrepresentation of the truth or concealment of a material fact;" the misrepresentation was made for the purpose of inducing another to act; and a person was induced to act to their detriment. *Nehme v. Smithkline Beecham Clinical Labs.*, 863 So. 2d 201, 205 (Fla. 2003). No member of the Board made any misrepresentations of material fact. (Pl.'s 2d Supp. Resp. to Defs.' 1st Interrog. #2-3, Exhibit A). Defendants did not conceal the rules and regulations governing all members of the condominium association. Moreover, HAWN was well aware of these rules at the time of the purchase of his condominium unit. (Compl. ¶¶ 23-25); (Pl.'s 2d Supp. Resp. to Defs.' 1st Interrog. #5, Exhibit A). Absent misrepresentations of material fact, which are tellingly absent from the facts of record, the conduct at issue in HAWN's Complaint does not amount to fraud.

Additionally, there is also no evidence that SHORELINE TOWERS engaged in self-dealing. Self-dealing involves the breach of a fiduciary duty. *See, e.g., Cohen v. Hattaway*, 595 So. 2d 105 (Fla. 5th DCA 1992). Specifically, self-dealing necessarily occurs in a situation where an officer or director uses his fiduciary capacity to profit or acquire some personal benefit or advantage that is not also available to his fiduciary beneficiaries. *Id.* at 107. Self-dealing typically contemplates the

-11-

existence of some sort of transaction. *Id.* None of Plaintiff's complaints regarding Defendants' conduct describe a transaction of any kind taking place. (Compl. ¶¶ 1-79); (Pl.'s 2d Supp. Resp. to Defs.' 1st Interrog. #1-14, Exhibit A). The Defendants did not profit or derive any personal benefit through its enforcement of the Association's rules and regulations. Nor did the Defendants' purported denial of HAWN's request for accommodation result in any personal gain. Therefore, Defendants did not engage in self-dealing.

Finally, Defendants were not enriched in any way. Unjust enrichment occurs where "(1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." *Cohen v. Kravit Estate Buyers, Inc.*, 843 So. 2d 989, 992 (Fla. 4th DCA 2003). HAWN does not claim that he conferred any type of benefit on the Defendants. At best, HAWN only suggests that Defendants' actions were against his wishes. In sum, even if Defendants did everything the Plaintiff complains of, none of the challenged conduct amounts to a crime, fraud, self-dealing, or unjust enrichment.

Since there is no basis for imposing tort liability on the BOARD MEMBERS pursuant to Fla Stat. § 617.0834, they are entitled to Summary Judgment as to Count III of Plaintiff's Complaint.

The same arguments listed above apply with full force to the Florida Housing Act because none of the BOARD MEMBERS acted in a willful manner. Instead, the facts of record show that each BOARD MEMBER focused on attempting to enforce the no animal policy of SHORELINE. Before deviating from this policy, the BOARD MEMBERS requested assistance of counsel, and, upon advice of counsel, requested additional information confirming that HAWN was handicapped.

-12-

There is no record evidence to suggest that any conduct by any of the BOARD MEMBERS willfully sought to deny an accommodation to HAWN for a discriminatory purpose. For example, in *Housing Opportunities Project For Excellence, Inc. v. Key Colony No. 4*, 510 F. Supp.2d 1003 (S.D. Fla. 2007), the court explained that individual board members can be held liable for their own unlawful conduct to the extent that it was ***willful***. *Id.* At 1013-1014 (emphasis added). The record makes clear that the BOARD MEMBERS did not act willfully and thus, should be deemed immune from liability under the Florida Fair Housing Act.

Defendants further argue that this immunity should extend to Plaintiff's claim under the Federal Fair Housing Act as well.

**III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS TO COUNT III OF PLAINTIFF'S COMPLAINT BECAUSE PLAINTIFF HAS FAILED TO ESTABLISH A PRIMA FACIE CASE OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER FLORIDA LAW.**

HAWN's third count asserts a claim for intentional infliction of emotional distress. (Compl. ¶¶ 69-75.) This Court should grant summary judgment for Defendants for at least three reasons: 1) Pursuant to section Fla. Stat. § 617.0834, Defendants LUTHER, FREEMAN, BRAZEALE, O'BRIEN, GINGER, DAVIS, and FAUST (the "BOARD MEMBERS") are immune from individual liability, as discussed above; 2) Neither SHORELINE TOWERS nor the BOARD MEMBERS engaged in "extreme" or "outrageous" conduct under Florida law; and 3) The Plaintiff did not suffer severe harm.

**A.    HAWN's Claim of Intentional Infliction of Emotional Distress Against Defendants, LUTHER, FREEMAN, BRAZEALE, O'BRIEN, GINGER, DAVIS, and FAUST, Must Fail Because the Defendants Have Not Engaged in Extreme or Outrageous Conduct.**

HAWN's claim of intentional infliction of emotional distress must also fail because

Defendants did not engage in any extreme or outrageous conduct. Florida law precludes recovery for intentional infliction of emotional distress unless the plaintiff proves that: (1) defendant's conduct was deliberate or reckless; (2) defendant's conduct was outrageous; (3) defendant's conduct caused plaintiff mental suffering; and (4) plaintiff's resulting emotional distress was severe. *See Metropolitan Life Insurance Co. v. McCarson*, 467 So.2d 277 (Fla. 1985); *Eastern Airlines, Inc. v. King*, 557 So.2d 574, 575 (Fla. 1990); *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir.1990)

The Defendants did not, and could not have known that their enforcement of the SHORELINE TOWERS' rules and regulations was likely to result in Plaintiff's emotional distress. (Defs.' Resp. to Pl.'s 1st Interrog. #6, 10, Exhibit U). In Plaintiff's initial requests for an exemption to the Association's rule prohibiting animals on the premises, he referred to Booster as a "pet" and did not mention his condition or need for accommodation. (Defs.' Resp. to Pl.'s 1st Interrog. #6, Exhibit U). Even assuming Defendants did know (or should have known) that HAWN would be harmed if he was prevented from keeping a dog in his condominium, Defendants did not engage in extreme or outrageous conduct.

Whether a defendant's challenged actions are so extreme and outrageous as to support a claim of intentional infliction of emotional distress is a question of law to be determined by the court. *Metro. Life Ins. Co.*, 467 So. 2d at 278-79;. In *Metro. Life Ins. Co.*, the Supreme Court of Florida adopted the definition of "extreme and outrageous" contained in *Restatement (Second) of Torts* § 46 (1965). Comment d to this Restatement section explains:

> Extreme and Outrageous conduct. The cases thus far decided have found liability only where the defendants conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has had intended to inflict emotional distress, or even that his conduct has

> been characterized by "malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*See also Metro. Life Ins. Co.*, 467 So. 2d at 278-79. To meet this standard, the plaintiff must describe conduct that is "so outrageous in character, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 278-79 (quoting RESTATEMENT (SECOND) OF TORTS § 46); *see also Swinarski v. Keller*, 529 So. 2d 1208, 1209 (Fla. 4th DCA 1988). To further demonstrate the high threshold a plaintiff must meet in an intentional infliction claim, the Third District Court of Appeal in *Williams v. Worldwide Flight Services, Inc.* held that defendant's conduct, which consisted of a job supervisor's use of racial epithets toward a subordinate employee, though "reprehensible, objectionable and offensive," was deemed insufficient to rise to level extreme and outrageous conduct. 877 So. 2d 869, 870 (Fla. 3d DCA 2004). In *Diamond v. Rosenfeld*, the Fourth District Court of Appeal affirmed a Circuit Court's determination that there was insufficient evidence to support an intentional infliction of emotional distress claim where defendants (1) threatened to kill plaintiffs' dog; (2) engaged in behavior which ultimately prompted Plaintiffs to get rid of their dog; (3) made anti-semitic remarks regarding Plaintiffs; (4) frequently complained about noise coming from plaintiffs' apartment; (5) alienated Plaintiffs from some of their neighbors; (6) made multiple threatening and harassing phone calls to Plaintiffs; (7) referred to one of the Plaintiffs as a "cripple" and accused him of rape; and (8) other behavior which the court described as basically making the Plaintiffs' lives miserable.

-15-

*Diamond*, 511 So. 2d 1031, 1033 (Fla. 4th DCA 1987).

Here, Plaintiff complains that he was subjected to intimidation, humiliation, and embarrassment as a result of SHORELINE TOWERS' enforcement of the condominium association's established rules and regulations. (Compl. ¶¶ 23-26, 70-71); (Pl.'s 2d Supp. Resp. to Defs.' 1st Interrog. #2, Exhibit A). Despite this rhetoric, HAWN admits that the only issue he really has against the Defendants, particularly the BOARD MEMBERS, is that they voted no to his request to change SHORELINE's no pet policy. Hawn Dep., p. 177-179, Exhibit G. HAWN claims that his mental and physical well-being depended on having Booster (his dog) live with him in his condominium. *Id.* He argues that SHORELINE TOWERS demonstrated indifference to his needs by denying his requests to be exempted from the Association's rules and regulations prohibiting animals from living on the premises. *Id.* He also asserts that he was treated poorly at a Board meeting and was demeaned when Booster was described as a "pet." *Id.*

When evaluating whether conduct is extreme or outrageous, Florida courts employ an objective standard. In applying this standard, "the subjective response of the person who is the target of the actor's conduct is not to control the question of whether the tort occurred." *Byrd v. BT Foods, Inc.*, 948 So. 2d 921, 928 (Fla. 4th DCA 2007) (citing *Ponton v. Scarfone,* 468 So. 2d 1009, 1011 (Fla. 2d DCA 1985)); *see also Livingston v. H.I. Family Suites, Inc.*, No. 6:05-CV-860-ORL19KRS, 2005 WL 2077315, *3 (M.D. Fla. Aug. 29, 2005). Therefore, it does not matter whether HAWN himself viewed the Defendants' conduct as extreme and outrageous. And it is not enough for it to be "possibly offensive to some civilized individuals." *Kingston Square Tenants Ass'n v. Tuskegee Gardens, Ltd.*, 792 F. Supp. 1566, 1576 (S.D. Fla.1992). The key inquiry is whether defendants' conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community."
*Metro. Life Ins. Co.*, 467 So. 2d at 278-79. "Whether [the] alleged conduct is outrageous enough
to support a claim of intentional infliction of emotional distress is a matter of law, not a question of
fact." *Id.* at 278; *Gandy v. Trans World Computer Tech. Group*, 787 So. 2d 116, 119 (Fla. 2d DCA
2001) (citing *Ponton*, 468 So.2d 1009); *Pucci v. USAir*, 940 F. Supp. 305, 309 (M.D. Fla.1996).

Viewing Defendants' conduct in a manner most favorable HAWN, he claims to have suffered
severe emotional distress due to: 1) Defendants' enforcement of a rule prohibiting animals from
living in condominiums; 2) Defendants' requirement that HAWN provide thorough documentation
to support his need for accommodation for his disability; and 3) Defendants' rude, offensive, and
insensitive behavior at Board meetings. This simply does not rise to the level of severity required
by Florida law because there is simply nothing outrageous about a Board choosing not to vote to
change an existing rule prohibiting pets from grounds of a condominium. *See Williams*, 877 So. 2d
at 870.

Moreover Defendants' conduct certainly does not match the severity of conduct that was
found insufficient in *Diamond*, 511 So. 2d at 1033. Defendants did not threaten physical harm to
HAWN or Booster. *Compare Diamond*, 511 So. 2d at 1033. Defendants did not falsely accuse
HAWN of a crime. *Compare Diamond*, 511 So. 2d at 1033. Defendants did not refer to him in
derogatory terms. *Compare Diamond*, 511 So. 2d at 1033. HAWN was not asked to vacate his
apartment. He was not required to appear before the Board to explain his medical conditions (though
he voluntarily did so). Defendants did not otherwise engage in any conduct that could reasonably
be interpreted as intimidating or harassing. *Compare with LeGrande v. Emmanuel*, 889 So. 2d 991,
995 (Fla. 3d DCA 2004) (holding there was no intentional infliction of emotional distress even

-17-

though defendant's conduct was "unsettling, embarrassing, and/or humiliating" to plaintiff).

Therefore, Defendants have not engaged in extreme and outrageous conduct as they have done

nothing that would be viewed by an average member of society as "atrocious" or "utterly intolerable

in a civilized society." *See Walters v. Blankenship*, 931 So. 2d 137, 144 (Fla. 5th DCA 2005)

(stating that an average member of the community should find the conduct "outrageous"). Because

Plaintiff has not shown how Defendants' conduct was severe and outrageous, Defendants are entitled

to Summary Judgment as to Count III of Plaintiff's Complaint as a matter of law.

**B.     HAWN's Claim of Intentional Infliction of Emotional Distress Against Defendants, LUTHER, FREEMAN, BRAZEALE, O'BRIEN, GINGER, DAVIS, and FAUST, Must Fail Because Defendants' Conduct Was Not of a Nature Especially Calculated to Cause Severe Emotional Distress.**

Even if this Court were to find Defendants' conduct was sufficiently extreme and outrageous,

HAWN's claim of intentional infliction of emotional distress still fails because Defendants did not

intend to cause severe emotional distress. Under Florida law, a plaintiff claiming intentional

infliction of emotional distress must show that defendant's conduct was "severe" or "of a nature

especially calculated to cause mental damage of a very serious kind." *Slocum v. Food Fair Stores*

*of Fla.*, 100 So. 2d 396, 397 (Fla. 1956); *Metro. Life Ins. Co.*, 467 So. 2d at 278-79. Here, the

Plaintiff has done nothing to distinguish between the emotional trauma that he claims to suffer as

a matter of course from the alleged emotional distress supposedly caused by the Defendants'

conduct. (Compl. ¶¶ 1-79); (Pl.'s 2d Supp. Resp. to Defs.' 1st Interrog. #1-14, Exhibit A). For

example, HAWN states that he was "very tearful and emotional" at a Board meeting. (Pl.'s 2d Supp.

Resp. to Defs.' 1st Interrog. #2-3, Exhibit A). But the Board never required him to attend a Board

meeting. Williams Dep., 9, Exhibit Q. Instead, Defendant merely requested the Plaintiff to submit

additional documentation of his need for accommodation. (Luther Dep., p. 17, Exhibit B). HAWN also describes how he suffered an "emotional breakdown" when he was not permitted to bring Booster into a condominium unit overnight. (Pl.'s 2d Supp. Resp. to Defs.' 1st Interrog. #3, Exhibit A); Deposition Transcript of William Ginger, p. 12-14, Exhibit C). Yet, HAWN made this request despite the fact that litigation over this very matter was ongoing. HAWN indicates that, without Booster, he isolates himself socially and his "social anxiety level *can* become severe." (Pl.'s 2d Supp. Resp. to Defs.' 1st Interrog. #2, Exhibit A) (emphasis added). However, this has nothing to do with Defendants' conduct. Even if this Court determines that Defendants refused a reasonable request to accommodate HAWN, their remains no evidence of record that shows that HAWN suffered severe emotional distress as a result. Because Plaintiff has failed to demonstrate that Defendants' conduct was designed to cause him severe emotional distress, Defendants are entitled to Summary Judgment as to Count III of Plaintiff's Complaint as a matter of law.

**IV.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS TO COUNT I OF PLAINTIFF'S COMPLAINT BECAUSE DEFENDANTS DID NOT VIOLATE THE FEDERAL AND FLORIDA FAIR HOUSING ACT[2].**

    **A.     Defendants did not violate the Federal Fair Housing Act by posting a sign that reads "No Animals Allowed."**

HAWN alleges that Defendants have violated two provisions of the Federal Fair Housing Act. First, HAWN alleges that Defendant violated 42 U.S.C. § 3604(c), which makes it unlawful:

        To make, print, or publish, or cause to be made, printed, or published

---

    [2]     Because the Federal and Florida Housing Acts are contain essentially identical provisions and implicate essentially the same facts for both claims in this case, the application of these statutes will be addressed together to avoid duplication. *See Dornbach v. Holley*, 854 So.2d 211, (Fla. 2d 2002) ("We are persuaded that, given the similarity of language and purpose in the federal and the Florida legislation, this three-pronged approach applies equally to the Florida Fair Housing Act.").

> any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. §3604(c).[3]  Both the Florida and Fair housing acts prohibit intentional discrimination, incidental discrimination and a failure to make a reasonable accommodation to a handicapped person (which shall be addressed in the next subsection).  *Dornbach v. Holley*, 854 So.2d 211, (Fla. 2d 2002) (citing *Advocacy Ctr. for Perss. with Disabilities, Inc. v. Woodlands Estates Ass'n*, 192 F.Supp.2d 1344 (M.D.Fla.2002). Intentional discrimination arises when advertisements or notices communicate, in an obvious and undeniable way, that there is a discriminatory preference. *Housing Opportunities Made Equal v. Cincinnati Enquirer, Inc.*, 731 F. Supp. 801 (S.D. Ohio 1990). Incidental discrimination arises when advertisements or notices are rendered discriminatory through the proof of extrinsic circumstances which demonstrate a discriminatory intent. *Id.*; *Saunders v. General Services Corp.*, 659 F. Supp. 1042, 1059 (E.D. Va. 1987) (applying a totality of the evidence standard to determining if extrinsic evidence demonstrates discriminatory intent behind an otherwise facially neutral ad or notice).  In order to evaluate whether a statement is impermissibly discriminatory under the Fair Housing Act, the court must evaluate whether the statement would "suggests to an ordinary listener that people with a particular ... status are preferred or dispreferred for the housing in question." *Burnett v. Venturi*, 903 F.Supp. 304, 315 (N.D.N.Y. 1995); *Housing Rights Center v. Donald Sterling Corp.*, 274 F.Supp.2d 1129, 1137-1138 (C.D.Cal. 2003).

---

[3]     Fla. Stat. §760.23(3) provides that it "is unlawful to make, print, or publish, or cause to be made, printed, or published, any notice, statement, or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, national origin, sex, handicap, familial status, or religion or an intention to make any such preference, limitation, or discrimination."

Here, Defendants posted a sign that reads "No Animals Allowed." This sign provided notice of a policy that had in place at Shoreline Towers for over ten years. Luther Dep., p.54, Exhibit B. On its face, there is nothing discriminatory about this sign, as it does not suggest to any reader that any protected persons under the Fair Housing Act would be discriminated against. Moreover, there is no evidence that this policy has ever been applied in a discriminatory fashion. All that does exist in this record is that HAWN himself was denied the ability to bring his service animal onto the premises.

### B.    Defendants did not refuse to make a reasonable accommodation to Hawn

In addition, HAWN claims that Defendants failed to provide him with a reasonable accommodation, i.e., permitting him to keep his service animal, Booster. HAWN claims that this conduct violates 42 U.S.C. §3604(f)(3)(B), which makes it unlawful to discriminate against a person by refusing "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. §3604(f)(3)(B).[4]  To prove this claim, HAWN must demonstrate that he is handicapped or disabled and that his requested accommodation is both reasonable and necessary. *Schwarz v. City of Treasure Island*, 521 So.2d 1307, 1322 (M.D. Fla. 2007); *Akridge v. City of Moultrie, GA*, Case No. 04cv31, 2006 WL 292179 (M.D. Ga. Feb. 7, 2006) (citing *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 794-95 (6th Cir. 1996). Moreover, HAWN must demonstrate that Defendants "knew or should reasonably be expected to know" of his handicap.

---

[4]    Fla. Stat. 760.23(9) provides that "discrimination includes ... [a] refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

*Dubois v. Ass. Of Apt. Owners of 2987 Kalakaua*, 453 F.3d 1175, 1177 (9th Cir. 2006).

The FHA defines handicap as a "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." *Schwarz v. City of Treasure Island*, 521 So.2d 1307, 1317 (M.D. Fla. 2007); 42 U.S.C. § 3602(h). A reasonable accommodation is necessary if it is established that but for the accommodation, the resident "will be denied an equal opportunity to enjoy the housing of [his] choice. *Schwarz v. City of Treasure Island*, 521 So.2d 1307, 1322 (M.D. Fla. 2007). Moreover, there must be a "link between the proposed accommodation and the equal opportunity being sought." *Id.*

Here, HAWN claims to suffer from a orthopedic handicap resulting from his left leg becoming atrophied after an accident he suffered nearly 20 years ago. *See* Pensacola Orthopaedics & Sports Medicine Report, dated 2/18/2008, attached hereto as Exhibit S. HAWN purports to have been treated by Doctor Hoda, a chiropractor. However, Doctor Hoda admits that he, in fact, never treated HAWN. All he did was conduct exams. *See* Deposition Transcript of Desmond Hoda, D.C., p. 26, attached hereto as Exhibit K; Deposition of Davis C. Hawn, p. 166, attached hereto as Exhibit G. In fact, Dr. Hoda characterized HAWN's symptoms as suffering from occasional pain. Hoda Dep., p. 24, Exhibit K. This is echoed by HAWN's orthopedic surgeon, Dr. Frank Schiavi, who opined as recently as April-May of 2007 that HAWN had a general good range of motion and can essentially perform whatever tasks he wishes, but if "does a little bit too much during the day" he "may" have problems with pain and leg aches. Deposition of Frank Schiavi, M.D., p. 5, 10, 13, 16-17, Exhibit M. In examining HAWN, Dr. Frank Shiavi relied on a "mini fuctional capacity exam" in assessing HAWN's medical condition. Deposition of Frank Shiavi, M.D., p. 25; p. 16-17, Exhibit

M. This exam was conducted by Joseph Frame, a physical therapist. Deposition Transcript of Joseph Frame, p. 5, 6, 13, Exhibit N. The mini fuctional capacity exam conducted by Mr. Frame consisted of listening to HAWN's subjective complaints, following by looking at HAWN's left leg, whereupon HAWN was asked to move his leg while Mr. Frame checked his range of motion. Frame Dep., p.18-20, Exhibit N. Ultimately, Dr. Schiavi never actually restricted HAWN in any of his activities. Schiavi Dep., p. 35-36, Exhibit M. This is consistent with the examination by Dr. Barry Lurate, who opined that what HAWN's symptoms indicate a disc space disease that may explain HAWN's subjective complaints of pain, HAWN has an "well maintained range of motion." *See* Pensacola Orthopaedics & Sports Medicine Report, dated 2/18/2008, attached hereto as Exhibit S. Under these facts it is clear any physical limitation experienced by HAWN does not *substantially* limits his major life activities. *Schwarz v. City of Treasure Island*, 521 So.2d 1307, 1317 (M.D. Fla. 2007); 42 U.S.C. § 3602(h). As such, he is not disabled under the FHA.

In addition, HAWN claims to suffer from psychological handicap as well in that he has post-traumatic stress arising out of a home invasion incident. Evans Dep., p. 7-9., Exhibit H. Dr. Ismin Zen, a pychiatrist, opined that it would be better for HAWN to have a service animal, but did not opine that it was necessary. Deposition Transcript of Ismin Zen, p. 39-40, Exhibit T. In fact, HAWN reported to Dr. Zen that he had no physical impairments, his psychomotor activity and thought processes were normal, and he did not suffer from paranoia. Zen Dep., p. 27-34, Exhibit T. Dr. Evans also testified that HAWN's dog is psychologically pleasing and without the dog, HAWN would likely opt to not use his condominium. Evans Dep., p. 17, Exhibit H. In addition, HAWN's lack of physical disability is punctuated by the fact that he traveled to Europe without his animal for an entire month. *See* Hawn Dep. 105-106, Exhibit G. None of these facts however, make permitting

-23-

access to HAWN to keep his dog a legally required accommodation.

Moreover, even if this Court were to disagree, there is no evidence that the Defendants "knew or should reasonably be expected to" have known about the handicap at the time that the Board sent its September 13, 2006 letter requesting additional information about HAWN's condition. HAWN presented the BOARD MEMBERS with two letters from his doctors, both of which were drafted by HAWN. Hoda Dep., p. 27, Exhibit K; Hawn Dep., p. 98, Exhibit G; Evans Dep., p. 12, Exhibit H. Moreover, both of these letters were signed by Doctors that had extremely limited opportunities to genuinely evaluate HAWN. For example, Dr. Hoda only examined HAWN once in 1999 and did not meet with HAWN again until seven years later in 2006. Hoda Dep., p. 17-19, 27, Exhibit K. In fact, Dr. Hoda never actually treated HAWN. Hoda Dep., p. 26, Exhibit K. Dr. Evans only met with HAWN three times prior to signing the form letter provided to him by HAWN. Evans Dep., p. 12, Exhibit H. Defendants requested additional information confirming the contents of these letters after consulting with counsel, but instead of providing this information, HAWN initiated this suit. Deposition Transcript of Jeffrey Luther, p. 17, Exhibit B.

The Ninth Circuit faced a similar situation in *Dubois*, which concerned refusal to permit a condominium owner to keep a service animal, in particular, an English bulldog named Einstein. *Dubois v. Ass. Of Apt. Owners of 2987 Kalakaua*, 453 F.3d 1175, 1177 (9th Cir. 2006). Dubois submitted letters from doctors recommending that Einstein be kept for medical reasons. *Dubois v. Ass. Of Apt. Owners of 2987 Kalakaua*, 453 F.3d 1175, 1178 (9th Cir. 2006). The condominium requested more information and permitted Dubois to temporarily keep Einstein until the review was completed. *Dubois v. Ass. Of Apt. Owners of 2987 Kalakaua*, 453 F.3d 1175, 1178 (9th Cir. 2006). The Ninth Circuit identified nothing impermissible in this approach. While the Court in Dubois

relied on the temporary lifting of the ban to determine that no refusal of accommodation was ever made, the Court never held that the board was required to temporarily permit Dubois access for his dog. It is also fair to take from this case that there was nothing impermissible about requesting verification. In this case, had verification been provided, it would have revealed that Dr. Hoda never actually treated HAWN, he merely examined him once in 1999 with two following up visits in April and May 2006. Hoda Dep., p. 17-19, 27, Exhibit K. Also, it would have shown that Dr. Evans only met with HAWN on three occasions prior to submitting his letter in support of HAWN's request to keep his dog. Evans Dep., p. 27-43, Exhibit H; Hawn Dep., p. 166, Exhibit G. During the first visit on May 17, 2006, HAWN related details of problems in his life, spoke of his relationship with his former abusive partner, Robbie, and described a phone call from Robbie, which he handled well. Evans Dep., 27-32, Exhibit H. HAWN visited Dr. Evans a second time on May 31, 2006. Evans Dep., p. 37, Exhibit H. Dr. Evans opined that HAWN was stable and noted that he requested that Dr. Evans sign a letter to support his desire to have a service animal, which was signed at or around HAWN's third visit. Evans Dep., p. 38-43, Exhibit H. Moreover, and most tellingly, both of the letters signed by Dr. Hoda and Dr. Evans were form letters downloaded from the internet and drafted by HAWN. Hawn Dep., 98; Evans Dep., p. 11-12, Exhibit H.

Even assuming that HAWN is deemed handicapped under the law, HAWN must still demonstrate the reasonableness and necessity of his request. *Schwarz v. City of Treasure Island*, 521 So.2d 1307, 1322 (M.D. Fla. 2007). Pet restrictions have been approved as permissible by Florida courts and in contrast to HAWN's assertion, are not per se improper. *Zeskind v. Jockey Club Condominium Apartments, Unit No. II, Inc.*, 468 So. 2d 1021 (Fla. 3d DCA 1985); *Majestic View Condominium Ass'n, Inc. v. Bolotin*, 429 So. 2d 438 (Fla. 4th DCA 1983); *Wilshire Condominium*

*Ass'n, Inc. v. Kohlbrand*, 368 So. 2d 629 (Fla. 4th DCA 1979) (restriction in declaration barring replacement of lap dogs enforceable).

As to reasonableness, HAWN knew at the time that he purchased his unit in June 2003, that SHORELINE had a no animal policy. Hawn Dep., p. 39, 131-132, Exhibit G. He also knew this fact when he decided to get his dog in 2004. Hawn Dep., p. 67, 131-132, Exhibit G. This policy had been in place at SHORELINE for many years. Luther Dep., p. 54, Exhibit B. As such, it is not reasonable for HAWN to request a drastic change in a long-standing policy without providing a basis for same. This was specifically requested of him in writing. *See* September 13, 2006 letter to Davis Hawn from Judy Williams, Exhibit Q. Moreover, there is no evidence of record that shows that HAWN could not receive the same benefits from other assistive devices.

As to necessity, HAWN is not blind, deaf, and does not suffer from an apparent inability to walk. There is nothing in the record that demonstrates that HAWN needs a service animal. All that the record does support is that it might be psychologically pleasing for HAWN to keep his dog. Zen Dep., p. 39-40; Evans Dep., p. 17, Exhibit H. HAWN clearly desires to take his animal to Shoreline Towers, but his strong desire does not translate into a necessity for purposes of the Fair Housing Act. His preference for a dog does not invalidate a policy that has been in effect for over 30 years. Moreover, a "reasonable accommodation" should not "undermine the basic purpose which the requirement seeks to achieve." *United States v. Village of Marshall*, 787 F. Supp. 872, 878 (W.D.Wis.1991). Defendants have a no pet policy in place because the owners of the condominium voted for such a rule. The role of any Board of a condominium association is to effectuate the will of the owners and generally run the property. As such, the Board is obligated to ensure that any deviations from policy are necessary. Because such necessity was lacking or otherwise not shown

by HAWN, no reasonable accommodation was due.

## CONCLUSION

The Fair Housing Act was never intended to be used as a vehicle for a pet owner to force his way past an otherwise legally permissible no pet rule which he knew about and to which he agreed when he purchased a condominium subject to the rule by the device of a contrived "handicap". Allowing a claim such as this to proceed will open flood gates of a significant magnitude by provision of a legal precedent fully backed by the force of Federal law to anyone who wants to take their pet with them anywhere they wish in complete disregard of the rights of the handicapped who legitimately need a service animal, in disregard of the rights of other non-handicapped citizens and in disregard of the agreements and obligations that persons such as the Plaintiff voluntarily accepted in the first instance. The Plaintiff would have every grocery store, mall, department store, movie theater, restaurant, hotel, motel, airport, airplane, and every other public place subject to the broad scope of the handicap protection afforded by the Fair Housing Act and, presumably, the Americans With Disabilities Act as well, forced open to a parade of supposed "service animals" based only upon any speculative assertion of a "disability" supported by submission of an owner-drafted letter or two from people who had either no treatment relationship, or a very limited treatment relationship, with the owner of the animal. This assertion stretches the scope of the very important laws in question beyond recognition.

Because the Fair Housing Act was not intended to apply to such circumstances and because Florida law does not support the remainder of the Plaintiff's claims, Defendants SHORELINE TOWERS, LUTHER, FREEMAN, BRAZEALE, O'BRIEN, GINGER, DAVIS, and FAUST, respectfully request this Honorable Court to enter an Order granting Summary Judgment in their

favor.

## CERTIFICATE OF COUNSEL CONFERENCE

Pursuant to N.D. Fla. Loc. R. 7.1(B)(3), counsel moving summary judgment need not confer with counsel for all parties prior to filing a motion for summary judgment.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was hand-delivered to: George R. Mead, II, Esq., Moore, Hill & Westmoreland, 220 West Garden Street, Ninth Floor, Pensacola, Florida 32501; and by United States First Class Mail to: Davis R. Warner, Esq., Venable, LLP, 575 7th Street, N.W., Washington, D.C. 20004; and Kishka-Kamari M. Ford, Esq., Venable LLP, 8010 Towers Crescent Drive, Suite 300, Vienna, Virginia 22182, this **21st day** of **April 2008.**

/S/ Millard L. Fretland

Millard L. Fretland, Esquire
Florida Bar No.: 0371671
CONROY, SIMBERG, GANON,
KREVANS, ABEL, LURVEY, MORROW
& SCHEFER, P.A.
125 West Romana Street
Suite 150
Pensacola, Florida 32502
Telephone: (850) 436-6605
Facsimile: (850) 436-2102
Attorneys for Defendant