# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

DAVIS C. HAWN

       Plaintiff,

     v.                                    Case No.: 3:07-cv-97/RV/EMT

SHORELINE TOWERS PHASE I
CONDOMINIUM ASSOCIATION, INC.,
JEFFREY LUTHER, NORMA FREEMAN,
JAMES L. BRAZEALE, GREG O'BRIEN,
WILLIAM L. GINGER, III, DESSIE DAVIS,
and CRAIG L. FAUST,

       Defendants.

_____/

## ORDER

Now under consideration is the defendants' motion for summary judgment (doc. 68).

## I. BACKGROUND

Unless otherwise indicated, the following facts appear to be undisputed. The defendant, Shoreline Towers Phase I Condominium Association, Inc. ("Shoreline"), is a condominium association and Florida corporation. The individual defendants, Jeffrey Luther, Norma Freeman, James L. Brazeale, Greg O'Brien, William L. Ginger, III, Dessie Davis, and Craig L. Faust, serve on the Shoreline board of directors (collectively, "the board" or "the defendants"). The plaintiff, Davis C. Hawn, owns a Shoreline condominium unit.

For several years, Shoreline has had a no pet policy and posted a sign on its property stating "No Animals Allowed." The plaintiff testified at deposition that he was aware of the policy when he bought his unit in 2004, but, at that time, he said he "wasn't concerned about it." That all changed, however, when he later adopted a Labrador Retriever named Booster. He wrote to the board on January 5, 2005, and proposed a

policy change so that homeowners "would be allowed to own a *pet*." (Emphasis added). Nowhere in this letter did the plaintiff claim that he was disabled or that Booster was a "service animal." In fact, it appears that Booster was a puppy at the time and, as will be noted, more than a year away from being certified as a service dog. The letter merely stated that the puppy had become his close companion who taught him "to be more responsible, caring, and less self-centered" and who "sleeps at the foot of my bed, and has even jumped into the shower to be with me." The plaintiff requested a six month trial period "to give folks a chance to prove that they love their *pets* as one would love any other family member." (Emphasis added).

The record does not appear to reflect what action the board took in response to the plaintiff's letter. It is apparent, however, that his request was either ignored or denied because more than a year later, on June 25, 2006, the plaintiff wrote another letter to the board, once again asking for permission to keep Booster in his unit. This time, he did not ask to keep him as a pet. Rather, he claimed that he was disabled and that Booster had been certified as a "service animal . . . dually trained to help me both physically and psychologically." For his alleged physical disability, the letter stated: "My ability to walk is restricted due to a debilitating injury to my leg. I am often in pain and my mobility is restricted. Booster performs many tasks that help overcome my physical disabilities which makes my life better."[1] For his alleged psychological disability, the plaintiff attached a separate letter stating that "a long time" before he had been abused, kidnapped, robbed, and assaulted by the stepson of a friend. Although the sequence of events is not clear, it appears that this person lived for a time in the plaintiff's unit while he was not there (and without permission), and one night he entered the house in the middle of the night while the plaintiff was home. He was eventually arrested on outstanding warrants. Nevertheless, the ordeal left the plaintiff afraid to be alone. He

---

[1] According to the allegations in his complaint, the plaintiff sustained this leg injury in November 2004. Yet, as noted above, he did not mention this fact --- nor did he claim that he was using his then-uncertified puppy as a service animal --- in the letter he sent to the board two months later, in January 2005.

*Case No.:* 3:07-cv-97/RV/EMT

explained to the board that "[i]f my service animal was in my condo he would at least make me aware of an intruder, summon help, and bring me the phone upon command." The plaintiff attached to his two letters Booster's "resume" and his various certification records.[2]

In addition to providing the board with the above materials, the plaintiff had two medical providers submit letters on his behalf. In one letter, a psychologist, Patrick Evans, Ph.D, opined that the plaintiff suffered from severe panic attacks; was unable to properly cope with anxiety and stress; and was particularly vulnerable "while residing at his home/condo due to past occurrences on that property." Dr. Evans thus wrote that he was "prescribing a service animal" to provide support and help plaintiff cope with his "emotionally crippling disability."[3]

In the other correspondence (which was also a short, one-page letter), a chiropractor, Desmond Hoda, wrote that he was "intimately familiar" with the plaintiff's history and the "functional limitations imposed by his disability." He opined that the plaintiff had "certain limitations regarding mobility" and that a support animal would "assist Mr. Hawn with his disability." Chiropractor Hoda made no attempt to explain what those purported limitations and disability were.[4]

---

[2] This included a brief description of what specific tasks Booster was able to perform, *e.g.*, bringing and removing his shoes and socks, opening the refrigerator and bringing him water, pulling him out of a chair, bringing him a phone in case of an emergency or panic attack, barking to notify if there is an intruder or to summon help, providing an exercise routine, creating a diversion to provide a reason to leave a bad situation, and "giving hugs" to calm after a panic attack.

[3] Although the defendants could not have known this at the time, the record shows that at the time Dr. Evans signed this one-page letter, his entire treatment of plaintiff consisted of two recent one-hour counseling sessions. During the second session, the plaintiff gave Dr. Evans the "text" or "template" for the letter that he wanted to be sent to Shoreline. Dr. Evans testified during deposition that he used "much" of what the plaintiff wrote, although he "probably made some changes" to the letter before sending it to the board.

[4] The record reflects that at the time he signed his letter, Chiropractor Hoda (like Dr. Evans) had seen the plaintiff only two times. Specifically, he examined the plaintiff

*Case No.:* 3:07-cv-97/RV/EMT

After sending the above materials, on July 29, 2006, the plaintiff attended a Shoreline board meeting. He asked to have his request put on the agenda, which it was, and then he read a speech explaining how Booster was a service animal who was helpful and necessary for him to overcome his disabilities. During the speech he voluntarily gave details of his personal life and medical history and became "tearful and emotional." He claims the board "ignored his request in deliberate indifference to his physical and mental impairments" and "treated [him] poorly" in that they suggested he move from Shoreline.

On or about August 28, 2006, Shoreline's general manager informed the plaintiff that the board's attorney needed additional information to consider his request, including documentation to support his alleged disabilities and the qualifications of Dr. Evans and Chiropractor Hoda. The plaintiff did not respond or otherwise provide the requested information. It appears he did not do so because, according to his interrogatory responses and deposition testimony, he felt that the letters were adequate and that the relevant information had already been provided.

On September 13, 2006, the general manager wrote a letter to the plaintiff and once again asked for documentation. She stated that "[t]his is a difficult letter to write," but "it has been determined that additional information is needed . . . to consider your request." The letter asked for information, not limited to:

> Additional expert evidence under oath of the nature of your impairment, the manner in which it substantially limits one or more of your major life functions or activities, how the requested pet is necessary to afford you an equal opportunity to use and enjoy your dwelling and if there are other corrective measures which will permit such use and enjoyment.

The letter concluded by stating that "[w]hile the Association sympathizes with your situation, *at this time* we must deny your request to keep a pet in your condominium unit

---

once several years earlier in 1999, and once in April 2006, shortly before he signed his letter to the board. For both visits Hoda only performed examinations; he did not render any treatment. The plaintiff drafted this second letter as well, and Chiropractor Hoda conceded at deposition that although he signed it, the plaintiff "wrote all of it basically."

*Case No.:* 3:07-cv-97/RV/EMT

3023." (Emphasis added). The plaintiff did not respond to this letter or provide the information that had been requested. Instead, he opted to file a complaint with the Florida Commission on Human Relations ("FCHR") on September 20, 2006. During the course of its investigation, Dr. Evans and Chiropractor Hoda completed Medical Certification Forms filed under oath, in which they opined that plaintiff had a disability and that a service dog was necessary. These forms were provided to the board at some point during the FCHR investigation. The FCHR eventually found there was cause to believe that the defendants discriminated against him by not providing a reasonable accommodation. The plaintiff later filed this action, alleging violation of the Federal Fair Housing Act (count I); violation of the Florida Fair Housing Act (count II); and intentional or reckless infliction of emotional distress (count III). He also sought an injunction (count IV).

In May 2007, while this litigation was pending, the plaintiff attempted to rent a unit from Shoreline and bring Booster onto the premises. He was advised that he could not do so, in response to which he had an emotional breakdown and ended up laying on the floor in the office lobby, with Booster "licking his face."

The defendants now move for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). On summary judgment, the record evidence and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. *National Fire Ins. Co. of Hartford v. Fortune Const. Co.,* 320 F.3d 1260, 1267-68 (11th Cir. 2003).

*Case No.:* 3:07-cv-97/RV/EMT

**III. DISCUSSION**

Counts I and II arise under the Florida Fair Housing Act and the Federal Fair Housing Act. Because these statutes contain essentially identical provisions, and implicate essentially the same facts for both claims, they will be considered together and collectively referred to as the "FHA." *See Loren v. Sasser,* 309 F.3d 1296, 1299 n.9, 1302-03 (11th Cir. 2002) (considering claims under both statutes together and applying the same analysis because "[t]he Florida Fair Housing Act contains statutory provisions that are substantively identical to the federal Fair Housing Act, and the facts and circumstances that comprise the federal and state housing claims are the same"); *accord Dornbach v. Holley,* 854 So.2d 211, 213 (Fla. 2d DCA 2002) (application of the federal act is "instructive and persuasive" in applying the state analogue, and, therefore, "given the similarity of language and purpose in the federal and the Florida legislation, [analysis under the federal act] applies equally to the Florida Fair Housing Act"). The plaintiff appears to allege that defendants have violated the FHA in two ways.

First, the plaintiff challenges the "No Animals Allowed" sign that is posted on Shoreline property. He contends that the sign "demonstrates a discriminatory intent" to violate section 3604(c) of the FHA, which prohibits a "notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on [handicap] or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c); *accord* Fla. Stat. § 760.23(3). He argues that discrimination can be inferred because if the point of the policy was merely to deny pets, the defendants could have just posted a sign that said "No Pets Allowed." Thus, because the term "animals" is a larger category than "pets," and would on its face arguably include service animals, the plaintiff contends that the sign establishes discriminatory intent. The plaintiff has not cited (nor have I been able to locate) any case law to support this argument. Although it could perhaps be worded more precisely, a sign that says "no animals" instead of "no pets" simply does not, by itself, reflect an intentional preference, limitation, or discrimination based on handicap in violation of the FHA.

*Case No.:* 3:07-cv-97/RV/EMT

The plaintiff also argues that the defendants have violated the FHA by failing to make a reasonable accommodation for his alleged disabilities. Under the statutes, it is unlawful to discriminate against a person by refusing "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); *accord* Fla. Stat. § 760.23(9)(b). "'Whether a requested accommodation is required by law is 'highly fact-specific, requiring case-by-case determination.'" *Loren, supra,* 309 F.3d at 1302 (quoting *Groner v. Golden Gate Gardens Apartments,* 250 F.3d 1039, 1044 (6th Cir. 2001)). To prevail, the plaintiff must establish (1) that he is disabled or handicapped within the meaning of the FHA, and that the defendants knew or should have known of that fact; (2) that the defendants knew that an accommodation was necessary to afford him equal opportunity to use and enjoy the dwelling; (3) that such an accommodation is reasonable; and (4) that the defendant refused to make the requested accommodation. *See generally Schwarz v. City of Treasure Island,* 544 F.3d 1201, 1218-19 (11th Cir. 2008); *see also United States v. California Mobile Home Park Management Co.,* 107 F.3d 1374, 1380 (9th Cir. 1997); *Jacobs v. Concord Village Condominium X Ass'n, Inc.,* 2004 WL 741384, at *1-2 (S.D. Fla. Feb. 17, 2004). The plaintiff fails at the first and second steps of this analysis.

The Eleventh Circuit has explained that a disabled individual for purposes of the FHA "is one who has (1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) been regarded as having such an impairment." *Loren, supra,* 309 F.3d at 1302 (quotation marks and brackets omitted). The parties spend much time arguing about whether the plaintiff's emotional and physical problems qualify as a handicap or disability under the governing law. I need not resolve this disputed issue. Assuming *arguendo* that plaintiff is disabled for FHA purposes, no reasonable jury could conclude

that the defendants knew or should have known of that fact.[5]

In January 2005, the plaintiff unsuccessfully lobbied the defendants for permission to keep Booster as a pet. He did not claim at the time that he was physically or psychologically disabled, even though he purports to have sustained his leg injury two months earlier, and even though he claims that he had been assaulted and stalked

---

[5] In attempting to demonstrate that he is disabled, the plaintiff relies heavily on evaluations he underwent, and diagnoses he received, many months (and in one case, more than a year) *after* the events giving rise to this case. In fact, nearly all of his medical and psychological evidence comes from examinations that took place in connection with this litigation. For example, he points to the opinions of Dr. Ismin Zen (a psychiatrist), Dr. Daniel Vujnovich (a clinical psychologist), Joseph Frame (a physical therapist), Dr. Frank Schiavi (an orthopedic surgeon) and Dr. Robert Lurate (an orthopedic surgeon and the defendant's expert), most of whom first met with plaintiff during the course of this case. Even if it is assumed that this evidence presents a genuine disputed issue of material fact as to whether plaintiff is *now* disabled --- and I am inclined to agree with defendants that it does not --- that is not the appropriate question. Rather, in deciding if the plaintiff is disabled, the only relevant time period is when the alleged discrimination occurred, that is, in or about September 2006, when the board denied his request to allow Booster in his unit. *Cf. Cash v. Smith,* 231 F.3d 1301, 1306 n.5 (11th Cir. 2000) ("The fact that Cash was eventually hospitalized for depression in July and September 1998 is irrelevant to this case. The employment action that Cash is complaining of occurred in late April and early May of 1998, and we evaluate her disability as manifested at that time."); *Pritchard v. Southern Co. Services.*, 92 F.3d 1130, 1133 (11th Cir. 1996) (the relevant question in disability discrimination case is whether employee had the claimed impairment "when she was terminated"); *Johnston v. Henderson*, 144 F. Supp. 2d 1341, 1353 (S.D. Fla. 2001) (plaintiff "must first prove that at the time she requested the accommodation, she had a disability as defined by the Act"); *accord, e.g., Browning v. Liberty Mutual Insurance Co.*, 178 F.3d 1043, 1047 (8th Cir. 1999) (noting that the decision whether an employee is disabled under the ADA must be made "as of the time of" the adverse action); *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996) (stating that to prove disability discrimination a plaintiff "must first establish as part of her prima facie case that she was a 'qualified individual with disability' *at the time of the discriminatory act*") (emphasis in the original). Given that the medical evidence in the record of the plaintiff's condition at the relevant time consisted solely of two letters that he primarily wrote himself --- which were then signed by medical providers who had very limited contact with him --- it is doubtful that the plaintiff can prove that he was disabled at the time of the alleged discrimination. However, as indicated above, I need not decide the issue and will assume he was disabled.

*Case No.:* 3:07-cv-97/RV/EMT

for many years. The year after his request for a pet was denied, he had the same dog certified as a service animal and claimed for the first time that he was disabled. Given this background, it is understandable that the board was suspicious of his disability claim. It is also understandable that those suspicions were not allayed merely because the board received short, one-page letters from Dr. Evans and Chiropractor Hoda. Dr. Evans's letter provided very little information about the plaintiff's alleged disability, while Chiropractor Hoda's letter did not provide any whatsoever. Neither letter indicated whether his limitations and difficulties were temporary or permanent, nor did they indicate that Booster was actually "*necessary* . . . to afford [the plaintiff] equal opportunity to use and enjoy a dwelling," as opposed to just desirable and helpful. *See* 42 U.S.C. § 3604(f)(3)(B) (emphasis added); *accord* Fla. Stat. § 760.23(9)(b). Notably, the letters also did not describe the providers' individual qualifications, background, or treatment history with the plaintiff.[6]

     Nevertheless, the board did not outright deny the plaintiff's request. It held a meeting, put the issue on the agenda, and allowed the plaintiff to give a speech in support. Even then the board did not deny the request, but rather it asked the plaintiff *twice* to provide additional documentation. He failed to do so both times. Given the lack of information they had (and in light of the fact that plaintiff had previously asked for permission to keep the same dog as a "pet"), no reasonable juror could conclude that the board knew the plaintiff was handicapped when it made the decision to deny his request. On this point, *Prindable v. Association of Apartment Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245 (D. Hawaii 2003), *affirmed sub nom. Dubois v. Association of*

---

     [6] Ironically, if the plaintiff had provided this particular information there can be little doubt that the defendants would have been justified in denying his request. Indeed, the treatment history would have revealed (1) that Dr. Evans had seen the plaintiff for only two recent one-hour counseling sessions, (2) that before he signed his letter, Chiropractor Hoda had not seen the plaintiff in approximately seven years (and never administered any treatment), and (3) that plaintiff substantially drafted both letters himself. *See supra* notes 3 and 4.

*Case No.:* 3:07-cv-97/RV/EMT

*Apartment Owners of 2987 Kalakaua,* 453 F.3d 1175 (9th Cir. 2006), is instructive.[7] That case involved two plaintiffs, Dubois and Prindable, who lived together in a condominium project that had a no pets policy. They asked the condominium board to make an exception, contending that they were both disabled under the FHA and that they should be allowed to have a service dog. In support of his request, Dubois submitted a letter from a doctor who recently saw him in connection with an earlier assault that occurred in his apartment building. The letter stated that the ordeal "'causes him to reasonably be concerned about his personal safety. He believes that his personal safety will be improved if he were to have a dog . . . . Please allow him to have a dog for his personal safety." 304 F. Supp. 2d at 1249. Dubois thus contended that the dog was necessary to help him "'cope with the stress, poor sleep patterns and problematic ailments' resulting from trauma from [the] earlier assault." *See id.* The defendants asked for additional information to substantiate this alleged condition (including the information on nature of his disability and why the requested pet is a reasonable accommodation), but none was provided. In granting summary judgment in favor of the defendants, the district court held that there was "no evidence that would lead a reasonable jury to conclude that Dubois is handicapped within the meaning of [the FHA] or, assuming Dubois is handicapped, that Defendants knew of this fact. Without such evidence, Dubois is not entitled to a reasonable accommodation under § 3604(f)(3)(B) and the inquiry need go no further." *See id.* at 1255 (internal citations omitted). This holding was justified because, as in this case, Dubois merely submitted an unspecific letter from his doctor and requests for additional information were ignored.

      The facts of *Prindable* and the facts of the case *sub judice* can be contrasted with *Jankowski Lee & Associates v. Cisneros,* 91 F.3d 891 (7th Cir. 1996). The plaintiff in *Jankowski Lee* requested an accommodation under the FHA. The defendants were generally aware that the plaintiff had a medical condition (multiple sclerosis), but they

---

[7] This district court case is, of course, not binding here. Nevertheless, I will discuss it in detail because it is strikingly similar to this case in many respects and I find the court's analysis persuasive.

*Case No.:* 3:07-cv-97/RV/EMT

claimed they were unaware that his disability was so severe as to justify the specific accommodation that he requested. The Seventh Circuit held:

> Petitioners' denial of Rusinov's request based on their lack of knowledge of the extent of his injury is simply a ruse to avoid the penalty for violating the FHA. It is telling that the Petitioners denied his request *without asking Rusinov for more information regarding his condition.*
>
> ***
>
> Petitioners denied Rusinov's request without asking for more information regarding the extent to which Rusinov's MS limited his activities. Had they asked, we presume that Rusinov would have provided them with the substantial documentation that he provided to HUD and the ALJ. *If a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request documentation or open a dialogue.*

*Id.* at 895 (emphasis added); *accord Jacobs, supra,* 2004 WL 741384, at *2 (holding same). As contemplated by the Court of Appeals in *Jankowski Lee,* the board here was apparently "skeptical" of the plaintiff's alleged disability, so it "request[ed] documentation" in order to "open a dialogue." For whatever his reasons, the plaintiff refused. Therefore, to the extent he was disabled and needed the accommodation, the defendants cannot be held responsible for not being aware of those facts.

Nor has the plaintiff adequately shown that the board knew the requested accommodation was *necessary* to afford him equal opportunity to use and enjoy the dwelling. Although obviously interrelated, this is a separate inquiry from whether the defendants knew that the plaintiff had a disability. *Prindable* is again instructive.

In that case, Prindable (Dubois's partner and roommate) made a separate request for the service dog. He submitted a note handwritten on a prescription pad from the Waikiki Health Center, which read simply: "Prindable has a medical illness for which a dog is necessary for his improvement." 304 F. Supp. 2d at 1249-50. The defendants explained to him that the letter was "not an acceptable certification for approval to possess a pet," and that he should submit an original letter from his physician describing the nature of the illness or disability and explaining "how a pet would alleviate

the effects of this handicap." *Id.* at 1250. The doctor was asked to provide (1) confirmation that Prindable was his patient, (2) information regarding his qualifications, practice, and medical licensing, (3) an explanation of the nature of Prindable's disability and why he needed the service animal, and (4) a statement that allowing him to keep the dog is a reasonable accommodation for his disability. Instead of providing the requested information, Dubois (on Prindable's behalf) contacted the Hawaii Civil Rights Commission ("HCRC"). Although defendants were not given the additional information that they requested, a separate medical provider (a behaviorist who had been treating Prindable for less than one month) wrote to defendants and stated that, based on her "admittedly brief assessment," Prindable had symptoms of depression and a pet would "have a positive impact on [his] condition and a separation from his pet would exacerbate his condition." *See id.* Thereafter, and particularly during the HCRC investigative process, his doctors submitted letters generally concurring with the behaviorists' letter and opining that he suffered from a mental dysfunction.[8]

      The district court assumed with respect to Prindable --- as I have with the plaintiff here --- that there was enough evidence that he was handicapped under the FHA. Nevertheless, while the letters were sufficient to create a genuine issue of material fact as to whether he was handicapped, the court noted "that is only one of the relevant factors in determining whether Defendants denied Prindable a reasonable accommodation. The question of whether Defendants were presented with sufficient evidence to conclude that the accommodation requested was necessary remains." *Id.* at 1258 n.28. The district court went on to hold that summary judgment was proper because the various doctor letters "were of limited value to Defendants." *Id.* at 1258. The letter from one of his doctors, for example, did not disclose the nature of the disability and thus "made it impossible for the [defendant] to determine whether Prindable" actually needed a service dog. *See id.* at 1258 n.27. The court explained that

---

      [8] This, as noted, is similar to what happened in this case. Dr. Evans and Chiropractor Huda only provided additional information during the course of the FCHR investigation.

*Case No.:* 3:07-cv-97/RV/EMT

"[t]he duty to make a reasonable accommodation does not simply spring from the fact that a handicapped person . . . wants such an accommodation made," but rather "Defendants must instead have been given an opportunity to make a final decision with respect to Plaintiff's request, which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law." *Id.* at 1258 (citations omitted).[9] The *Prindable* court further explained that:

> In order to show that the disabled person needs the assistance of a service animal . . . it is reasonable to require the opinion of a physician who is knowledgeable about the subject disability and the manner in which a service dog can ameliorate the effects of the disability. The foregoing letters do not provide a basis from which Defendants could make this determination. Accordingly, Defendants had no meaningful opportunity to consider Prindable's request for a reasonable accommodation. . .

*Id.* at 1259 (quotation marks and citations omitted). The district court thus concluded that defendants did not act improperly in requesting additional information. "Landlords are not precluded from inquiring into and verifying the asserted handicapped or the necessity of the accommodation sought. . . . The Court finds no evidence to indicate that Defendants were unwilling to reasonably accommodate Prindable if shown to be necessary for his equal use and enjoyment of unit 102." *Id.* at 1260.

The same analysis and conclusion applies here. There is no evidence that the defendants would have refused to accommodate the plaintiff if he had provided adequate documentation that he was disabled and needed a service dog. Indeed, it is notable that the board did not just outright deny the plaintiff's request, as was done in *Jankowski Lee, supra,* but rather tried to get additional information to make an informed decision. Insofar as the two brief letters submitted by Dr. Evans and Chiropractor Hoda were deficient in the several ways already noted, the board was well within its rights to

---

[9] The Eleventh Circuit has quoted *Prindable* for this proposition and explained that, "[i]n other words, the City cannot be liable for refusing to grant a reasonable and necessary accommodation if the City never knew the accommodation was in fact necessary." *Schwarz, supra,* 544 F.3d at 1219 (quotation marks and citations omitted).

*Case No.:* 3:07-cv-97/RV/EMT

request additional information. Accordingly, the plaintiff has failed to establish that the board knew the accommodation was necessary on the facts of this case, and the FHA claims (counts I and II) must necessarily fail.

I will next consider the plaintiff's claim for intentional infliction of emotional distress (count III). This cause of action requires that the conduct in question be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Metropolitan Life Ins. Co. v. McCarson,* 467 So.2d 277, 278-79 (Fla. 1985) (*quoting* Restatement (Second) of Torts § 46 (1965)). "Florida courts use a very high standard in evaluating whether the facts alleged are sufficiently outrageous to support a claim for intentional infliction of emotional distress." *Foreman v. City of Port St. Lucie,* 294 Fed. Appx. 554, 557 (11th Cir. 2008). Whether this "very high standard" has been met is a question of law. *Vance v. Southern Bell Tel. & Tel. Co.,* 983 F.2d 1573, 1575 n.7 (11th Cir. 1993) (under Florida law, "'the issue of whether or not the activities of the defendant rise to the level of being extreme and outrageous so as to permit a claim for intentional infliction of emotional distress is a legal question in the first instance for the court to decide as a matter of law'") (citation omitted).

For this claim, the plaintiff contends that he was treated poorly in that the defendants "wrongfully claim[ed] that he was requesting the use of a pet rather than a trained service animal." He further claims that, in deciding to deny his request, the board acted with "reckless disregard for the impact [that its] callous decisions would have on [him]." The plaintiff has wholly failed to satisfy the high standard for intentional infliction of emotional distress, and summary judgment is appropriate on this claim as well.

Having disposed of counts I-III, that necessarily moots the plaintiff's request for an injunction (count IV).[10]

---

[10] The defendants have argued that the board has statutory immunity under Section 617.0834, Florida Statutes, which provides that directors and officers of not-for-profit corporations and associations (of which Shoreline is one) cannot be held individually liable for "monetary damages to any person for any statement, vote,

*Case No.:* 3:07-cv-97/RV/EMT

## IV. CONCLUSION

For these reasons, the defendants' motion for summary judgment (doc. 68) is GRANTED. The clerk is directed to enter judgment in favor of the defendants and against the plaintiff, together with taxable costs.

**DONE and ORDERED this 12th day of March, 2009.**

/S/ *Roger Vinson*
**ROGER VINSON
Senior United States District Judge**

---

decision, or failure to take an action," unless they breach their duties as officers of the organization and their conduct otherwise constitutes a crime, fraud, self-dealing, or unjust enrichment. This argument would appear to have merit and might well have been dispositive (at least as it concerns the individual defendants). However, as the plaintiff points out, defendants failed to raise this immunity as an affirmative defense in their answers. Because the case ultimately fails for the reasons stated above, I need not consider whether immunity under section 617.0834 was an affirmative defense that was required to be raised or waived.

*Case No.:* 3:07-cv-97/RV/EMT